The UNITED STATES of
America, Plaintiff,

v.

Richard L. HUNT, Defendant.

No. CR 3–84–238–R.

United States District Court,
N.D. Texas,
Dallas Division.

Oct. 8, 1987.

Cheryl B. Wattley, Asst. U.S. Atty., Dallas, Tex., for plaintiff.

Michael F. Pezzulli, Rebecca Covell, Sifford & Pezzulli, Dallas, Tex., for defendant.

MEMORANDUM OPINION

BUCHMEYER, District Judge.

This opinion concerns the revocation of probation of a defendant because he failed to act in good faith in attempting to make restitution to the victims of his crime—a credit card scam in which over 7,800 victims were defrauded of at least $264,000.[1]

*The Law*

A defendant's failure to pay a fine or to make restitution *is not* grounds for revocation of probation if the default "results from a condition, like poverty, which is attributable to no fault of his own." *United States v. Irvin,* 820 F.2d 110, 111 (5th Cir.1987).[2] See also *Bearden v. Georgia,* 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983).

However, if the defendant fails "to make a good-faith attempt" to pay the fine or to make restitution, then the conditions of probation have been violated. *United States v. Turner,* 741 F.2d 696, 698 (5th Cir.1984); *United States v. Irvin,* 820 F.2d at 111. As stated in *United States v. Boswell,* 605 F.2d 171, 175 (5th Cir.1979):

"The basic issue is whether at any time between imposition of sentence and revocation of probation the defendant had resources available which could have been used to make the required restitution, in whole or in part. If during the crucial period he had not the resources and no way to acquire them then probation should not have been revoked for a failure to pay.

"On the other hand, if [the defendant] did have the resources available, then the issue is reduced to whether, in fact, he either negligently or deliberately allowed them to be disbursed or dissipated in a manner that resulted in his inability to pay. It must be remembered, however, that revocation may not be inflicted for

---

1. The opinion constitutes this Court's findings of fact and conclusions of law supporting the revocation of probation. See *United States v. Irvin,* 820 F.2d 110 (5th Cir.1987). See also Fed.R. Crim.P. 32.1.

2. See *United States v. Taylor,* 321 F.2d 339, 341 (4th Cir.1963) (defendants' failure "to pay fines within a specified time" was not grounds for revoking probation "if in reality he was too poor to pay, not to blame for it, and sincere in the try").

occurrences, events, or conditions over which [the defendant] had no control."

These tests—whether framed in terms of "good faith" (*Turner*), or "negligence" or "deliberate misconduct" (*Boswell*), or "circumstances beyond the defendant's control" (*Irvin*)—present questions of fact and credibility determinations for the trial judge. And, "all that is required for the revocation of probation is enough evidence to satisfy the district judge that the conduct of the [defendant] has not met the conditions of probation." *United States v. Dozier*, 707 F.2d 862, 865 (5th Cir.1983); *United States v. Irvin*, 820 F.2d at 111; *United States v. Turner*, 741 F.2d at 698.

## THE FACTUAL BACKGROUND

### (i) *the credit card scam*

The defendant involved in this probation revocation is Richard L. Hunt.

For over nine months, Hunt and his two co-defendants—Mary Tubbs and Susan Maddox—engaged in a mail fraud scheme involving credit cards. Basically, they ran false advertisements in many publications (such as The National Enquirer); these ads stated that persons could obtain credit cards—*regardless of their past credit record*—simply by completing an application[3] and returning it with a check for $35.00. But, as described in *United States v. Hunt*, 794 F.2d 1095, 1097 (5th Cir.1986):

"The complying customer would receive no credit card, however; rather, he would receive only a seven page booklet entitled 'Ten Easy Steps to Good Credit.' No advertisement or brochure had mentioned anything about such a booklet, and several customers later testified that the ads led them to expect the delivery of actual credit cards. Those calling the company to complain reached only an answering service. Their complaints, however, eventually reached the United States Postal Service, whose investigation eventually led to the seizure of the companies' business records and to criminal indictments."

Before they were stopped, the three defendants had defrauded 10,507 victims of over $358,000. Applications from 2,673 victims were seized, so this money ($86,825.00) was refunded by the Postal Service. However, there remained some 7,800 victims, spread throughout the country, who had been swindled out of over $264,000 by Hunt and his co-defendants.[4]

### (ii) *the sentence of probation*

Hunt, Tubbs and Maddox were tried and convicted of multiple counts of mail fraud. *United States v. Hunt*, 794 F.2d at 1096–97. This Court, in the Presentence Reports, received recommendations to sentence each defendant to a substantial term of imprisonment. Sentencing was set for May 17, 1985.

However, material submitted by the defense attorneys—including a financial statement of the defendant Richard L. Hunt[5]—showed that Hunt had a net worth of $4.7 million. Although the other two defendants had very little money,[6] the evidence at trial demonstrated that (a) the defendant Mary Tubbs had the ability to take care of all administrative and secretarial duties in mailing refunds to the thousands of fraud victims, and (b) the defendant Susan Maddox, with her background in advertising and public relations, had the ability to perform community service designed to prevent others from being defrauded by similar "credit services" schemes.[7]

---

**3.** "The application itself requested information concerning employment and income, just as actual credit card applications would." *United States v. Hunt*, 794 F.2d at 1097.

**4.** This amount does not equal $35.00 per victim because (a) the Postal Service also seized $3,650.00 in cash from the companies, and (b) during part of the scheme the defendants only charged $25.00 per application.

**5.** This financial statement, dated January 1, 1985, is Court Exhibit 3(a) at the probation revocation hearing. (*All further references to exhibits will be to those introduced at the revocation hearing.*)

**6.** Both Tubbs and Maddox were divorced mothers, who had small children to support. Neither had any prior criminal record.

**7.** This was consistent with their roles in the credit card scam. The evidence had established that Mary Tubbs acted as the office manager and secretary; that Susan Maddox had prepared

This presented a unique situation. Because of the financial resources of one defendant and the abilities of the other two, it appeared possible to make restitution to the thousands of victims—*without any cost to the government.* Accordingly, sentencing was deferred to give the three defendants time to submit a detailed proposal both for *complete* restitution of the $264,000 to the 7,800 victims and for community service. After their initial submissions—and meetings between the Court and defense counsel—the final proposal of the defendants for "full restitution" was made on August 17, 1985. This proposal (Court Exhibit 1), which was signed by Richard Hunt and his two co-defendants, stated:

"In accordance with your meeting with our attornies (sic), we are re-submitting this proposal in hopes it will be pleasing to the court.

"We agree to make full restitution.... As per the court's instructions *we will mail refunds in six groups of approximately $42,083.50, the first to take place September 15, 1985* following at sixty day intervals ending July 15, 1986....

"We will also institute the Public Service plan you approved...."

When the defendants proposed, on August 15, 1985, to make the total restitution over a nine-month period—*with the first payment to be mailed to the victims within 30 days*—each of them knew (just as this Court did) that Richard Hunt would be responsible for paying almost all of the restitution, with the other defendants performing the community service obligations. (See footnotes 6 and 7.)

At the final sentencing hearing (August 23, 1985), their joint proposal was accepted, with minor modifications: the amount of restitution was fixed at $264,126.00; the six payments were set at $44,000; and, because of delay in entry of the Judgment

and Probation Order,[8] the first refund mailing was scheduled for October 30, 1985—six weeks later than the date on which Hunt and his co-defendants had promised to begin restitution—but with the final payments still to be made by July 15, 1986.

### (iii) *the appeal by Hunt*

Despite the proposal which saved Hunt from a term of imprisonment, he did not provide funds for the first two restitution payments (due October 30 and November 30, 1985). In fact, on August 30, 1985 Hunt had filed a notice of appeal from the sentence of probation.

Then, on December 2, 1985, Hunt filed a motion for stay of the sentence pending appeal. On January 10, 1986—just before the third refund payment was due—Hunt filed an affidavit in support of this motion. There was no claim, *either in the motion or the affidavit, that Hunt was not financially able to make restitution;* instead, they claimed that Hunt would suffer "irreparable harm" if he was required to make restitution while the appeal was pending. By opinion dated March 11, 1986, his motion to stay was denied:

"After conviction and sentence, the defendant—Richard L. Hunt—has moved for a stay of execution and relief pending appeal. Because there are no 'substantial questons of law or fact likely to result in reversal or an order for new trial,' this motion is denied.

"The defendant claims he will suffer irreparable harm if he makes restitution to the victims before the appeal is concluded. However, *the longer the delay, the less likelihood that restitution can be made to the numerous, low-income victims of the offense.* This Court—in making the decision to order restitution, rather than imposing prison terms upon the defendant and the other parties con-

---

the various advertisements and forms used in the mail fraud; and that Richard Hunt had provided almost all of the money for the criminal scheme.

**8.** The Judgment and Probation Order, which details the restitution plan and the community service obligations, is *Appendix A* to this opin-

ion. Under it, all of the refund checks returned because the victims could not be located were, after the expenses of the community service obligations, to be paid "to a victims' restitution fund, as directed by the United States Probation Office."

victed with him—took this very fact (i.e., delay in restitution) into consideration.

"Therefore, if the restitution is not begun immediately by the defendant Richard L. Hunt, this Court will hold a probation revocation hearing to determine whether or not probation should be revoked and the defendant Hunt should be sentenced to the custody of the Attorney General."

Notwithstanding this order, Hunt never made any of the restitution payments which he and the other two defendants had proposed. On July 25, 1986—ten days after restitution was to have been completed —the Fifth Circuit rejected Hunt's appeal. *United States v. Hunt,* 794 F.2d 1095 (5th Cir.1986).[9] On August 21, 1986, a petition was filed to revoke the probation of all three defendants. On September 26, 1986, a probation revocation hearing was held.

At this hearing, because the defendants Mary Tubbs and Susan Maddox had not been responsible for the fact that restitution payments had not been made—they were waiting for the money from Richard Hunt (see footnotes 6, 7)—their restitution obligations were reduced to $15,000 each. With respect to the defendant Hunt, this Court advised him that it did not believe

that Hunt had taken his obligations seriously or that he had made a sincere effort to make restitution. (See Court Exh. 5, pp. 23–24). The September 1986 hearing was recessed, with Hunt being ordered to provide business and personal records and financial statements to the Probation Department.

The revocation hearing concerning Hunt was continued on March 27, 1987. Then, on June 5 and June 12, 1987, a full evidentiary hearing was held to determine whether or not Hunt's probation should be revoked because of his failure to make the restitution payments.

## THE REVOCATION OF PROBATION

Certain facts were undisputed at the evidentiary hearings. Most, however, were contested—and the conflicting claims require fact findings and credibility determinations by this Court.

### (i) *undisputed facts*

It is undisputed that the defendant Richard Hunt presented several financial statements to this Court and to the supervising probation officers. The first, an unaudited financial statement dated January 1, 1985, was submitted in August of 1985 in connection with Hunt's request for probation.[10]

---

**9.** Hunt's appeal was based entirely upon objections to the charge given to the jury—e.g., absence of a "good faith" instruction (794 F.2d at 1097–98); absence of instruction that "good reputation for honesty may [of itself] create a reasonable doubt" (794 F.2d at 1098–99); failure to use the words "bad purpose" in defining "wilfully" (794 F.2d at 1099–1100). The Fifth Circuit panel (Gee, Higginbotham, Harvey) rejected each challenge, as they did Hunt's final attack—which concerned this Court's use of a definition of "proof beyond a reasonable doubt" that is different from the standard definition in the U.S. Fifth Circuit District Judges Association, Pattern Jury Instructions (1983). However, with regard to the "reasonable doubt" instruction used by this Court—which is quoted in the *Hunt* opinion, 794 F.2d at 1100—the panel, speaking through Judge Gee, stated:

"Although no grounds for reversal exist, we take this opportunity to encourage the district courts to follow the Pattern Jury Instructions promulgated by the United States Fifth Circuit District Judges Association. Having already acknowledged the wide leeway trial courts possess in charging juries, the many variances existing among the courts' instructions only provide more ammunition for those appealing

their convictions. A measure of uniformity would certainly render appellate review easier and quicker." (794 F.2d at 1101.)

This Court certainly had no intention of making the work of the Fifth Circuit more difficult by deviating from the Pattern Jury Instructions of the Fifth Circuit District Judges Association. However, the definition of "reasonable doubt"— to which these critical comments are directed— was taken directly from *Pattern Criminal Jury Instructions,* published by the Federal Judicial Center (June 1982). Presumably, the Fifth Circuit did not intend to suggest that district judges should not use the Judicial Center pattern instructions—particularly since (i) Fifth Circuit Judge Patrick E. Higginbotham, who was a member of the *Hunt* panel (794 F.2d at 1096), was also a member of the committee which drafted the *Pattern Criminal Jury Instructions* for the Judicial Center, and (ii) that committee did succeed in improving and simplifying "existing pattern instructions used in federal district courts," including the Pattern Jury Instructions of the Fifth Circuit District Judges Association.

**10.** This financial statement was attached to the Presentence Report before the May 17, 1985 sentencing. When that hearing was recessed, it

It showed that Hunt's net worth was $4.7 million.[11] (Court Exh. 3a).

It is also undisputed that the defendant Hunt has not made any payment on the $264,126.00 restitution—with the exception of $100.00, which he paid one or two weeks before the revocation hearings were held in June of 1987.

Finally, it is undisputed that Richard Hunt is in severe financial difficulty—and that, *at the present time*, he is not able to make any restitution payments. Although Hunt has not filed personal bankruptcy, a number of judgments have been taken against him; he owes his ex-wife over $12,-000.00 in child support and alimony; and creditors have foreclosed on some of the assets listed by Hunt on the first financial statement. (See Def. Exhs. 7, 9–16, 27–28).[12]

### (ii) *the conflicting claims*

The government claims that, despite Hunt's present financial circumstances, he did not act in good faith in attempting to make restitution payments. Specifically, it argues that the evidence shows that Hunt could have made partial payments on the restitution ... that the two probation officers who supervised Hunt tried to get him to make partial payments ... that Hunt deliberately, if not in bad faith, "repeatedly made conscious decisions to dispose of his funds in other ways than paying restitution" ... and that "the evidence showed Hunt to be a man living an extravagent lifestyle, having an expensive condominium and automobile, and not someone who was on the brink of poverty."

In response, the defendant Hunt claims that he was never told by either probation officer—Jimmy Maddox or Bob Wetherholt —that he could make partial payments on the $264,126.00 restitution. Instead, Hunt argues that the evidence shows that he always "was under the firm conviction" that he had to pay the full amount of each of the six restitution payments ... that he never had the money or financial ability to pay the full amount ... and that, therefore, "no attempt to tender less than [the full] amount" was made.[13]

### (iii) *the bank accounts*

The evidence clearly established that the defendant Richard Hunt had access to the funds of ten separate bank accounts.[14] Although some of these appeared to be business accounts,[15] Hunt paid his personal living expenses out of all of these accounts—

was resubmitted in connection with the August 17, 1985 proposal signed by all three defendants.

11. The second financial statement, dated April 20, 1985, indicated that Hunt had no liabilities other than personal living expenses (Court Exh. 3b). The third, dated March 31, 1986, showed that Hunt had a net worth of only $138,299.00 (Court Exh. 3c). The fourth, dated February 19, 1987, reflects that Hunt's net worth was $1,025,-809 (Court Exh. 3d).

12. Hunt did try to sell some of the assets listed on the first financial statement. For example, he had contracts of sale on the office building at 2339 Inwood—valued at $2 million on the January 1985 financial statement—but these sales fell through because of the lack of financing. See Def. Exhs. 21–24.

13. Although not raised in the Defendant's Opposition to Probation Revocation (filed June 26, 1987), the defendant Hunt—at one point during his testimony—seemed to claim that at no time did he have anough money to even make partial payments on the restitution. For the reasons stated below, any such claim by Hunt is totally false.

14. Seven of these are listed in Def. Exh. 17, which is Hunt's own summary of the bank account records. The accounts, which had different opening and closing dates, were: (1) Texas American Bank—*Hunt Cable;* (2) Republic Bank Greenville—*Hi Video Cable;* (3) Republic Bank Greenville—*Richard L. Hunt Special;* (4) Haltom Bank—*Richard L. Hunt;* (5) First City Bank Richardson—*Richard L. Hunt;* (6) Allied Bank—*R.L. Hunt Co.;* (7) Allied Bank—*Bestway Travel.* The others are: (8) Banquest First National—*Alameda Santa Fe Ltd;* (9) Sunbelt Savings—*H.H.T. Partnership;* and (10) Texas American—*Richard L. Hunt Special.* Govt. Exh. 1.

15. The defendant argues that the funds in the "Allied Bank—Bestway Travel" account was not "Mr. Hunt's money over which he had control, but was in fact owned by third-parties and was merely being held in trust" for travel arrangements. This is somewhat surprising since the defendant's own analysis (Def. Exh. 17) shows that Hunt wrote checks on the Bestway Travel account to his ex-wife ($1,000.00), his daughter ($250.00), VISA ($500.00), American Express ($2,095.57), and himself ($2,480.00).

including child support and alimony, his charge accounts (VISA, American Express), his daughters' charge accounts (MBank), utilities, car expenses, charitable contributions, etc. (See Def. Exh. 17).

E.D. Odom, the postal inspector who investigated the original mail fraud charges, performed an analysis of these accounts. This analysis (Govt. Exh. 1) proved that:

(a) Over $1.1 million moved through these accounts from July of 1985 through February of 1987;

(b) The combined monthly closing balance of these accounts showed cash available for restitution payments during each month—with the exception of October and December of 1985—with amounts ranging from $12–13,000 (February and March of 1986), to over $30,000 (August and September of 1985), to over $62,000 (November of 1986).

(c) The combined balance of these 10 accounts at the time of the revocation hearing was less than $200.00.

In response, the defendant Hunt testified that the money from the bank accounts was used for business expense and loan payments—"payments to preserve his assets"—as well as child support, alimony, and personal living expenses. Indeed, even under Hunt's analysis (Def. Exh. 18), he spent $36,875.88 for personal expenses and $34,618.00 for "family support payments."[16] Moreover, on cross-examination, Hunt conceded that he made the decision to use the money to pay other bills, instead of paying any amount on the restitution.

It is clear, therefore, that the defendant Richard Hunt—during the period in question—did have access to sufficient funds to have made some payments, if not significant partial payments, on his restitution obligation. Despite this, Hunt choose to make no restitution payments at all.

**(iv) *credibility: partial payments***

The defendant Richard Hunt testified that he "was always desirous of paying the Court," and that he did not make any partial restitution payments because neither probation officer told him that partial payments could—or should—be made. This testimony is rejected because it is false.

Jimmy Maddox, Hunt's first probation officer, testified that he told Hunt on numerous occasions that he should make *any* payments he could on the restitution. Hunt's second probation officer, Robert Wetherholt, also testified that he told Hunt that he could pay less than the full amount. Contrary to the defendant's argument, the notes of both probation officers (Court Exh. 5) confirm their testimony—and their repeated attempts to get the defendant to make "any," or "significant," or some partial payments on the restitution.[17]

This conflict in testimony presents a credibility determination for this Court. The testimony of probation officers Maddox and Wetherholt is credited because they were telling the truth; the testimony of Richard Hunt is totally discounted—*because he was lying.*

Therefore, the credible testimony and evidence at the probation revocation hearing establishes that the defendant knew that he should make partial payments on the restitution—but that he deliberately elected not to do so.[18]

---

**16.** Hunt's summary (Def. Exh. 18) fails to reflect that many of his personal bills—such as the expenses for his car and his condominium (4114 Wycliff)—were being treated as business obligations. And, a detailed review of Hunt's analysis of the bank accounts (Def. Exh. 17) shows that Hunt, as the government argues, was living in a *very* comfortable lifestyle, not like "someone on the brink of poverty."

**17.** Jimmy Maddox supervised Hunt's probation from the date of sentencing, August 23, 1985, until August of 1986, when Robert Wetherholt assumed the supervision. Court Exh. 5.

**18.** The defendant claims that he knew any offer of partial payment would be rejected because the Court had refused to let Tubbs and Maddox make partial restitution. The letter he relies upon (Def. Exh. 25, 26) was written in *September of 1985,* shortly after sentencing. In fact, after their restitution obligations were reduced to $15,000 each (see Court Exh. 5, pp. 23–24), both Tubbs and Maddox were permitted to make partial payments.

**(v) *credibility: the "deal" that came through***

Throughout the period of probation, the defendant Hunt repeatedly told the probation officers that he would be able to make restitution payments after he sold some property or after a "deal" went through. His lack of credibility is further shown by what actually happened when a "deal" did go through in November of 1986—*less than two months after the first probation revocation hearing, September 26, 1986,* when this Court advised Hunt that it had serious doubts that Hunt was going to make any sincere effort to pay the restitution.

On November 24, 1986, the defendant Hunt sold one of the assets listed on the financial statement: a note secured by property at 2727 Oak Lawn. He deposited the proceeds of the sale—$104,566.36—in the "Allied Bank—R.L. Hunt Co." account. Then, as shown by defendant's own analysis (Def. Exh. 17), Hunt proceeded to spend over $36,000.00 of this deposit within six weeks on the following personal matters:

| | |
|---|---|
| American Express | $ 1,431.84 |
| VISA | 2,075.46 |
| MBank (daughters credit cards) | 2,750.00 |
| Ex-wife | 6,000.00 |
| Daughters | 700.00 |
| Car Expense | 1,616.63 |
| Utilities | 208.44 |
| Regency Marine | 3,596.26 |
| Miscellaneous | 873.57 |
| Attorneys Fees | 500.00 |
| Attorneys Fees | 18,881.45 |
| Penthouse Subscription | 28.00 |
| **TOTAL:** | **$38,661.65** |

At the end of November of 1986, this bank account had a balance of $62,521.87. By the end of December, the account had a balance of only $5,317.06. And, despite the Hunt's repeated statements that he would make restitution payments "when a deal went through," *not one dollar of this*

*$104,566.36 was used to make any payment on the restitution.*

**(vi) *credibility: other matters***

The lack of credibility of the defendant Hunt is also demonstrated by the fact that misrepresentations were made on the financial statements he submitted. For example, on the financial statement used by the defendant to obtain probation in August of 1985 (Court Exh. 3a), his residence—a condominium at 4114 Wycliff—is shown to have a value of $175,000 with "No Debt." In fact, the defendant had mortgaged this property to the Bank of Dallas two months earlier, on June 24, 1985, for a $78,840.00 loan (Def. Exh. 28). This debt was never disclosed until the defendant "transferred" the residence to a "corporation," and then immediately filed bankruptcy for that corporation, to prevent foreclosure by the Bank. (See Def. Exhs. 2, 3).

Similarly, the financial statement did not reflect (a) that the HTH Partnership, valued at $1,250,000, had been subject to a $205,549.56 debt since November 10, 1984 (Def. Exh. 6); [19] or (b) that various judgments had been taken against Hunt before this financial statement was presented in connection with his request for probation. (See Def. Exhs. 11, 16).

Despite these and other discrepancies,[20] the defendant now makes the surprising argument that the first financial statement shows that he was "grossly illiquid" and, consequently, that he was not able to meet the schedule for restitution payments. This argument conveniently ignores one critical fact: that it was the defendant himself who, in order to get probation, proposed that full restitution could be accomplished by July 15, 1986 (Court Exh. 1).

The defendant Hunt also claims that, "at the hearing held in October, 1986, [he] offered to assign to the Court any interest he

---

**19.** Demand for payment of this debt was made on December 17, 1985; and, by March 31, 1986, this "$1,250,000" asset was shown to have *no* value (Court Exh. 3c).

**20.** For example, three "notes receivable" listed on the statement—Compton ($150,000), Johnson

($150,000), Von Ins ($450,000)—were pledged to the Haltom City Bank, which later foreclosed upon them. Other financial obligations not disclosed by the defendant Hunt at any time before the probation revocation hearing are reflected in Def. Exhs. 10, 12, 13, 14, and 15.

## 272

had in his largest illiquid asset: the Inwood [office] building." At the revocation hearing in June 1987, Hunt also purported to tender his "equity" in the condominum at 4414 Wycliff. It is obvious that the expenses of accepting and selling this property would exceed any proceeds that could be obtained. Moreover, at the time of the June 1987 hearing, Hunt did not have any interest in these properties—because he had "transferred" both the Inwood office building and the Wycliff condominium to corporations, which immediately filed bankruptcy proceedings to stop creditors from foreclosing on them. (See Def. Exh. 2, 3). And, of course, neither of these purported tenders could serve as an excuse for the defendant's failure to make restitution payments.[21]

CONCLUSION

It would be improper, of course, to revoke the defendant's probation because he is in "severe financial distress" and because he cannot, at this time, pay the required restitution. It would also be wrong to revoke probation because of any "dramatic decline in the Dallas real estate market" which affected Hunt's ability to sell his assets.

However, the defendant Richard Hunt certainly had funds available to make partial payments of the restitution—and he knew that he could, and should, make partial payments. Despite this, he deliberately ignored his obligations to make restitution, using substantial sums for his own personal benefit. Then, he attempted to shield his misconduct by lying at the probation revocation hearing.

Richard Hunt did not make a "good faith" effort to pay the restitution. *United States v. Irvin,* 820 F.2d at 111. He did have "the resources available" to make significant payments on the restitution—but he deliberately "disbursed or dissipated [them] in a manner that resulted in his inability to pay." *United States v. Boswell,* 605 F.2d at 175. And, this Court is convinced that the evidence shows, very clearly, that Hunt "has not met the conditions of probation." *United States v. Dozier,* 707 F.2d at 865.

For these reasons, the defendant Hunt has violated the conditions of his probation, and that probation is revoked.

---

**21.** It should be obvious from this opinion that the defendant Hunt never tendered to the Court the note on the 2727 Oak Lawn property— which he sold for $104,556.36, *within one month of the supposed tender of his equity in the Inwood office building.*

## APPENDIX A

United States of America vs.

DEFENDANT

RICHARD. L. HUNT

**United States District Court for**

NORTHERN DISTRICT OF TEXAS AT DALLAS

DOCKET NO. ——▶ CR 3-84-238-R

## JUDGMENT AND PROBATION/COMMITMENT ORDER

**COUNSEL**

In the presence of the attorney for the government the defendant appeared in person on this date ——————▶

| MONTH | DAY | YEAR |
|-------|-----|------|
| 08 | 23 | 85 |

[___] WITHOUT COUNSEL   However the court advised defendant of right to counsel and asked whether defendant desired to have counsel appointed by the court and the defendant thereupon waived assistance of counsel.

NORTHERN DISTRICT COURT

[X] WITH COUNSEL [_____ Frank Jackson _____]
4114 Wycliff #5, Dallas, TX 75219 (Defendant's Address)

**F I L E D**

**PLEA**

[___] GUILTY, and the court being satisfied that there is a factual basis for the plea,   [___] NOLO CONTENDERE,   [X] NOT GUILTY OCT 2 8 1985

NANCY HALL DOHERTY, CLERK

By _____ Deputy

**FINDING & JUDGMENT**

....ing a ...... verdict of { [___] NOT GUILTY. Defendant is discharged   [X] GUILTY.

Defendant has been convicted as charged of the offense(s) of    mail fraud in violation of 18 U.S.C. § 1341 and 2, as charged in Counts 1-5 and 7-15 of the October 3, 1984 fifteen-count Indictment.
[Offenses committed prior to November 1984.]

**SENTENCE OR PROBATION ORDER**

The court asked whether defendant had anything to say why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the court, the court adjudged the defendant guilty as charged and convicted and ordered that: The defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of

IT IS ADJUDGED on Count 1 that the imposition of sentence is suspended and the defendant is placed on probation for a period of five (5) years.
IT IS ADJUDGED on Counts 2 through 5 and Counts 7 through 15 that the imposition of sentence is suspended and the defendant is placed on probation for a period of five (5) years on each count, each to run concurrent with the sentence on Count 1, and with the following Special Conditions of Probation:

**SPECIAL CONDITIONS PROBATION**

1. That the defendant make restitution in accordance with the attached restitutioin plan.

2. That the defendant perform community service work in accordance with the attached community service plan.

(Count 6 was dismissed at the time of trial.)

**ADDITIONAL CONDITIONS OF PROBATION**

In addition to the special conditions of probation imposed above, it is hereby ordered that the general conditions of probation set out on the reverse side of this judgment be imposed. The Court may change the conditions of probation, reduce or extend the period of probation, and at any time during the probation period or within a maximum probation period of five years permitted by law, may issue a warrant and revoke probation for a violation occurring during the probation period.

**COMMITMENT RECOMMENDATION**

The court orders commitment to the custody of the Attorney General and recommends,

It is ordered that the Clerk deliver a certified copy of this judgment and commitment to the U.S. Marshal or other qualified officer.

**SIGNED BY**
[X] U.S. District Judge
[___] U.S. Magistrate

JUDGE JERRY BUCHMEYER

Date  October 28, 1985

### A. Restitution

1. The defendants shall make restitution in the total amount of $264,126.00 and, except as provided below in paragraph 4, shall pay *all* of the expenses required to make this restitution.

2. This restitution shall be made by the mailing of a $35.00 refund check to each of the victims of the defendants' fraud who have not already received restitution. This mailing shall be done in six separate installments by the following dates and in the designated amounts:

| October 30, 1985 | $ 44,000.00 |
| November 30, 1985 | 44,000.00 |
| January 15, 1986 | 44,000.00 |
| March 15, 1986 | 44,000.00 |
| May 15, 1986 | 44,000.00 |
| July 15, 1986 | 44,126.00 |
| | $264,126.00 |

3. The defendants shall do all of the work involved in mailing the checks as required by paragraph 2. However, an independent CPA firm shall be retained to do the following:

(i) Maintain exclusive control of the bank account out of which the refund checks are to be written ("the Refund Account");

(ii) Deposit in the Refund Account the money paid by the defendants to cover this restitution and its expenses;

(iii) Write the refund checks, based upon information provided by the defendants, and mail those checks in addressed and stamped envelopes provided by the defendants;

(iv) Maintain exclusive control over all checks which are returned because the letters of refund cannot be delivered;

(v) Submit a report to the Court after each mailing which covers the total amount of refund checks issued, the total amount of returned checks, the balance of the Refund Account, and any other matters as directed by the United States Probation Office.

4. The defendants shall pay all expenses required to make this restitution, subject to the following:

(i) The $3,650.00 in cash seized by the government during the search in this matter shall be deposited into the Refund Account;

(ii) All checks which are returned because the letters cannot be delivered, or which have not been cashed within a period of ninety (90) days from the date of mailing, shall be credited to the Refund Account.

The expenses incurred in making this restitution—printing, postage, accounting fees, etc.—shall be paid from the Refund Account; provided that, if the $3,650.00 in each and the amount of any returned checks is not sufficient to cover the expenses of restitution, then the defendants shall pay the balance of these expenses in addition to the restitution of $264,126.00.

5. After restitution has been made, and after the expenses of restitution and community service have been paid (see part B), the balance shall be paid to a victim's restitution fund, as directed by the United States Probation Office.

B. *Community Service*

1. The defendants shall provide community service, as approved and directed by the United States Probation Office, designed to prevent others from being victimized by "credit services" schemes similar to the defendants fraud.

2. This community service plan shall include the following:

(i) *Written contacts with tabloid publishers and with publications* which carry "credit services" advertisements—including the sources in which the defendants advertised—advising them of the outcome of this trial and of the fact that they may be running fraudulent "credit services" advertisements.

(ii) *Written contacts with each "credit service" business* who advertises in these tabloid and other publications [see (i) ] advising them of the outcome of this trial and of the fact that their "credit service" advertisements may result in criminal prosecution.

(iii) *Advertisements by the defendants* in the "credit services" section of each of these tabloid and other publications advising the consumers (a) that the defendants are contacting customers to make refunds (and why), and offering to send free information to anyone interested in "mail order credit cards," (b) that other advertisements in this section may offer only booklets or information for money, *not a credit card.*

(iv) *Free information provided by the defendants* to those who respond by mail to these advertisements [see (iii) ] in the form of edited copies of the existing manuals of the defendants.

(v) *Press releases* issued to wire services, news services and consumer magazines, and contact television and radio stations, to attempt to obtain articles and publicity about credit fraud problems.

(vi) *Notification to the Federal Trade Commission*, as well as *the appropriate Postal Service Division* and *the appropriate state consumer protection agency* in each state in which one of the "credit service" businesses is located to advise them (a) of the outcome of this trial, (b) the results of the defendants' contacts with publishers and with the "credit service" businesses located within each Postal Service Division and each state.

3. The details of this plan of community service, including the estimated cost of each item, shall be completed and submitted to the United States Probation Office for approval by November 15, 1985. Thereafter:

(i) The written contacts with publishers [see 2(i)], the written contacts with each "credit service" bureau [see 2(ii)], and the press releases shall be accomplished by December 30, 1985.

(ii) The advertisements [see 2(iii)] shall be submitted for publication by January 15, 1986.

(iii) The notices to the regulatory agencies [see 2(vi)] shall be sent by March 15, 1986.

4. The defendants shall submit an interim report to the Court concerning their community service obligations on April 15, 1986, and a final report on July 15, 1986.

5. The expenses of this community service plan shall be paid out of the Refund Account (see Part A), but only after approval of the United States Probation Office.